WILLIAM A. BORDEN *vs.* THE TOWN OF WESTPORT
ET AL.

Third Judicial District, New Haven, June Term, 1930.
WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

Argued June 3d—decided October 3d, 1930.

*Warren F. Cressy,* for the appellant (plaintiff).

*Raymond E. Baldwin,* for the appellees (defendants).

HAINES, J.   This action was begun in August, 1922, and a judgment was rendered defining the respective rights of the parties in March, 1925, and the plaintiff appealed to this court.   Error was found and a new trial was ordered.   *Borden* v. *Westport,* 105 Conn. 139, 134 Atl. 803.   Upon the second trial the court found the issues for the defendants and the plaintiff has again appealed.   The second trial was begun early in December, 1927.   After various adjournments by agreement of counsel, the case was argued February 2d, 1928, and thereafter briefs were filed.   Judgment was rendered February 6th, 1929.   Prior to that decision a misplaced exhibit caused the application by the court to counsel for the plaintiff for a duplicate which counsel agreed to furnish, making no protest or objection to the delay.   In his brief, the plaintiff calls attention to the fact that the judgment of the trial court was not filed until after the end of the term or session next succeeding that at which the trial was

had and suggests that it is therefore in conflict with General Statutes, § 5409. Beyond calling attention to the fact and pointing out the salutary purpose of the statute, he makes no claim for relief at the hands of this court. Moreover, it appears that while the draft-finding contains two paragraphs touching this matter and it is included by the plaintiff in the claims of law said to have been made to the trial court, it is in no way referred to in the conclusions of the trial court in the finding, nor included in the appended list of the claims of law made by the plaintiff. Neither in the motion to correct the finding nor in the exceptions taken by the plaintiff is the matter mentioned or referred to, and in the assignments of error the plaintiff omits it altogether. Under these circumstances we cannot do otherwise than conclude that the plaintiff voluntarily waived consideration of the question by this court. To obtain consideration upon appeal to this court of claimed errors of the trial court they should be "specifically stated in the reasons of appeal." General Statutes (Rev. 1918) § 5837; *Mazzotta* v. *Bornstein,* 105 Conn. 242, 245, 135 Atl. 38; *Draus* v. *International Silver Co.,* 105 Conn. 415, 418, 135 Atl. 437; *Hines* v. *Norwalk Lock Co.,* 100 Conn. 533, 535, 124 Atl. 17. We point out that a judgment rendered under these circumstances is irregular but not void. If no timely and appropriate advantage is taken of the delay, it will be assumed that the parties consented to it. *Lawrence* v. *Cannavan,* 76 Conn. 303, 306, 56 Atl. 556; *Whitford* v. *Lee,* 97 Conn. 554, 557, 117 Atl. 554; *Cheshire Brass Co.* v. *Wilson,* 86 Conn. 551, 560, 86 Atl. 26.

The plaintiff claims to have acquired title to a certain tract of land on the shore of Long Island Sound in the town of Westport, through a certain line of deeds, the history of which appears in outline in the

text of our former decision in 105 Conn. at pages 140-146. The tract claimed by the plaintiff is described by him as bounded northerly by a "driftway, right-of-way or lane," easterly by land of Helen R. Mitchell and by a raceway, southerly by Long Island Sound and westerly by land of Stanley B. Fillow. It is included within the bounds of a larger tract which lay between Compo Pond, so-called on the north and Long Island Sound on the south, the western boundary being what is known as the Hills Point Road running nearly north from Long Island Sound past the west end of Compo Pond. This larger tract was bounded on the east by water consisting of a portion of Compo Pond, a projection or inlet from Long Island Sound and channels or streams which form the outlet and inlet of Compo Pond. In 1662 Charles Second of England granted to the Colony of Connecticut certain lands by charter among which were included lands in the Parish of Greens Farms and the town of Fairfield, and these charter lands included the larger tract just described. In 1680 the proprietors of the town of Fairfield acquired title from the Indians to a large tract of land which also includes the last-mentioned tract. In 1685 they also obtained from the General Court a patent to such lands and this patent was confirmed by the General Court in 1703. The first individual interest in this land appears to have been obtained by one Thomas Ockley, who erected a tidewater mill upon Compo Creek, an outlet of Compo Pond, by authority of a vote in town meeting in Fairfield April 17th, 1705. By that vote a committee was appointed, consisting of three persons, to treat with Ockley, "about ye premises for all things" and to "lay out unto him not exceeding half an acre." The following day this committee entered into an agreement with Ockley which appears in the

text of our former decision, 105 Conn. at pages 142 and 143, but no reference was made to any particular portion of land, nor does it appear that any land was set out to him by any metes and bounds whatever. The mill was built and operated and was later conveyed by Ockley to George Cable, who in 1793 conveyed to one Scribner. In the latter conveyance we find the first reference by metes and bounds to a particular portion of land. The transfer covers the gristmill and its privileges "with about an acre of land adjoining, bounded westerly by the highway and on all other parts by creek and beach." The trial court found that the mill property, so-called, with the mill building standing thereon was always a separate and distinct parcel of land, and it is referred to in all the conveyances shown by the record, as containing one acre more or less. The measured area of this particular parcel is 1.34 acres and that of the balance of the land claimed by the plaintiff, including the road or driftway, is 1.23 acres, making his total claim under his title deeds, about two and one half acres. The pivotal question between the parties involves the exact location of the western boundary line of the land acquired by the plaintiff by these deeds. He claims this western boundary was originally the Hills Point Road, but now makes no claim to a certain tract lying immediately east of this road which was at one time enclosed in part by a stone wall and is known as the Bumpus tract, and later conveyed to one Fillow, by whom the plaintiff now claims to bound his land on the west instead of on Hills Point Road. The defendants claim, however, that the boundary which was first described in the deed to Scribner as "highway," did not refer to the Hills Point Road at all but to the road which is described in the complaint as driftway, right-of-way, or lane. The trial court in

both trials found this to be an ancient public highway which has existed from time immemorial. It runs from the Hills Point Road easterly toward the mill, and at a point opposite the southwest corner of the mill, now marked by a hedge, it branches northeasterly to the creek at the border of the mill pond, and runs thence across this creek. It was found that in some other conveyances and leases of the mill property it is referred to as "highway" and in some as "road" and has been and still is maintained by the town. South of this road and west of the so-called mill property is the tract in dispute, consisting of an open sandy beach as distinguished from upland. It is this sandy beach to which the plaintiff lays claim and which the defendants claim is "common lands," held for the benefit and enjoyment of the people at large. The conclusion of the trial court in both trials was that the west boundary of the land which plaintiff acquired by his deeds extended from a point near the junction of the road to the mill with the northeasterly branch of that road, thence southerly along the west boundary of the property of Helen R. Mitchell which was deeded to her by the plaintiff, and to the west wall of the raceway. As thus described the property of the plaintiff was bounded on the west by the branch road referred to and by the sandy beach in question, and with this west boundary line the tract contains approximately 1.34 acres. The location of this west boundary line was and is practically determinative of the whole case. The court in each instance reached the conclusion that the plaintiff had no right or title to this sandy beach lying west of the boundary line so determined. The conclusions of the trial court judge at the second trial and of the judge who presided at the first trial, are in accord as to the location of this line. Both heard much involved and compli-

cated testimony and inspected many documents, deeds, leases and public records, and the record shows that at the second trial the judge personally visited and examined the premises by consent of counsel. All the documents and papers introduced as exhibits are certified to this court together with what we must assume is all the testimony relevant to the questions raised by the plaintiff on this appeal. The plaintiff seeks to avoid the effect of the decision of the trial court by obtaining at our hands sweeping changes in the finding of vital facts and by claims of error in the application of certain principles of law and in rulings upon evidence.

He requests fourteen changes in the finding and a large amount of evidence is printed in the record with reference to them together with numerous citations of exhibits not printed. A study of each of these requests and of the evidence and exhibits does not show justification for extensive changes. Of those paragraphs which the plaintiff asks to have stricken out, we find none which are unsupported by evidence or by reasonable inference and deduction from evidence before the trial court. Many of the changes and additions, even if made, would have no effect whatever upon the decisive features of the case. Some of these are not supported by evidence, and none of those which are important are supported by evidence which is uncontradicted. There are three paragraphs of the draft-finding which can be added as requested, though we consider them of minor importance under the issues. We add the following:

"43. On November 9, 1908, the plaintiff, who had caused a map to be made of said premises, placed the same on record, said map being Exhibit E in said cause."

"44. In and by said map the plaintiff divided the

premises in dispute into seven building lots, and indicated a roadway on the easterly and westerly sides of the building lots, leading from the roadway to the beach. The westerly roadway from the mill property to the beach was along the Bumpus tract, so-called, and was substantially the location of an ancient driftway."

"53. The ten foot driftway running from the roadway northeasterly to the pond had a bar-way anciently across it." This bar-way consisted of two rails to keep cows from the pond, and they were removable by anyone who wished to use the road.

We are compelled to add the last sentence to paragraph 53 in order to make this finding reflect the true situation.

It is unnecessary to comment in detail upon the various requests. We note at least two attacks upon the finding on the ground that the use made by the trial court of the word "beach" is incorrect, covering as it does the entire tract in question. It is urged that the word means only that portion of the shore between high and low-water marks. It may be admitted that this is the technical definition, but the word has, in common parlance, another and well recognized use in designating that portion of the shore consisting generally of sand and pebbles, resulting usually from the action of the water, as distinct from the "upland," to which it often extends above normal high-water mark. *Wakeman* v. *Glover*, 75 Conn. 23, 27, 52 Atl. 622; *Merwin* v. *Wheeler*, 41 Conn. 14, 26. The trial court found that in the various conveyances before the court, this was the sense in which the word was used. We concur in this view. Indeed, counsel for the plaintiff himself uses the word in this sense many times in the record and in his brief to designate this sandy tract without reference to the normal high-water mark.

A long and detailed study of the evidence and exhibits made necessary by these requested changes in the finding goes to the root of the case. The plaintiff's requests clearly reflect an attempt to change the decision by obtaining a reversal of the trial court's conclusions as to the underlying facts. It seeks in effect a retrial of the facts by this court. "The claims most strongly urged all depend upon this court's finding upon the evidence a series of facts different from those adjudicated by the trial court. This we cannot do." *New Haven* v. *New York, N. H. & H. R. Co.*, 72 Conn. 225, 231, 44 Atl. 31. Whether upon all the evidence put before us, we would in all respects have reached the same conclusions the trial court reached, is not important. It is evident to us from our own study of this evidence and the exhibits that the conclusions reached by the trial court were the result of careful and painstaking consideration, and in no instance do we discover any fact found which is not reasonably supported by evidence. Where there was conflicting evidence, and there was really very little, it was the province of the trial court to attach credibility to such evidence as its judgment dictated. With the witnesses all before it, supplemented by a familiarity with the premises obtained by personal inspection, there is every reason to treat its conclusions as correct save where, under our rules, it would be our duty to change the finding. Not only are the subordinate facts properly supported by evidence, but the conclusions reached from these facts are, so far as we can discover, reasonably and logically drawn. It results that the judgment must stand unless other reasons of appeal attacking the application of principles of law, or the rulings on evidence, are valid, and constitute reversible error. There are four exceptions to rulings on evidence, the first two relating to the admission of three deeds offered

by the defendants, Exhibit 19, Exhibit 20 and Exhibit 21. The description of the premises in these deeds was the same as that in the plaintiff's own title deed. All these were the deeds of the plaintiff's predecessors in title through whom the plaintiff traces his claim, and were offered to explain the boundaries of the land described in the complaint. The plaintiff objected to their admission because (1) they did not support any claim of title or interest in the defendants themselves, (2) they furnished no evidence of the location of the land described in the deed, and (3) they had no supporting testimony from witnesses and the plaintiff had no opportunity for cross-examination. We take judicial notice of the record and briefs in the former presentation of this case to this court, from which it appears that the plaintiff himself introduced these same deeds and claimed title through them. The deeds in their chronological order were (1) warranty deed from Abraham Sherwood, Franklin Sherwood and Francis Sherwood to Henry B. Sherwood and Daniel Sherwood, dated March 4th, 1853, Exhibit 21; (2) warranty deed from Daniel Sherwood and Henry B. Sherwood to The Stamford Manufacturing Company, dated May 14th, 1855, Exhibit 20, and (3) warranty deed from The Stamford Manufacturing Company to F. Wayland Fellowes, dated July 20th, 1885, Exhibit 19; the deed of F. Wayland Fellowes to the plaintiff and Frederick F. Lewis, being the plaintiff's title deed, Exhibit A, Exhibit B. All these three deeds were "ancient deeds" being more than thirty years old, and being in proper custody, it was not necessary to call the attesting witnesses or to offer any testimonial evidence. They proved themselves. 4 Wigmore on Evidence (2d Ed.) p. 557, § 2138; *Petroman* v. *Anderson,* 105 Conn. 366, 370, 135 Atl. 391; *Hamilton* v. *Smith,* 74 Conn. 374, 379, 50 Atl. 884; *New Haven* v. *New York, N. H.*

& H. R. Co., 72 Conn. 225, 232, 44 Atl. 31; *McMahon* v. *Stratford,* 83 Conn. 386, 76 Atl. 983. The plaintiff concedes' that the descriptions are the same as in his own title deed and we note in his brief that they are listed in detail in his abstract of title to the premises claimed in the complaint. Each of the deeds, including the plaintiff's own title deed, makes the next preceding deed by reference a part thereof. They were properly admitted.

The next reason of appeal relates to the admission of the testimony of Lawrence Donahue who had lived for fifty-three years about a quarter of a mile from the premises in question, who said that Aaron Sherwood had lived in the next house for his lifetime and died about 1913 or 1914; that Sherwood had lived there ever since the witness could remember and owned the property he lived on; that when he died he was an old man; that he frequently saw him on the disputed premises and had a conversation with him at one time thirty-five or forty years before while they were standing together near the west end of the mill itself. Over the plaintiff's objection the witness then stated that Aaron Sherwood at that time pointed out to him the west boundary of the so-called mill property and told him that was the boundary line; that Sherwood called it the charter property. The witness then pointed out the line so shown him, on the map in evidence, Exhibit G. At the close of the evidence the plaintiff moved to strike out this testimony on the ground that the defendants had failed to show any further knowledge of this property on the part of Aaron Sherwood, who or what he was, or how he came to know about it. It was the claim of the plaintiff that the question was the same as that decided in *Borden* v. *Westport,* 105 Conn. 139, 134 Atl. 803. The testimony there considered was that of a former owner of the property

and it was shown that the statement made was in effect one which may have been in his own interest. Such is not the present situation. Aaron Sherwood was never the owner of the property in dispute nor in possession of it. The authorities hold that the statement of a deceased declarant who was in fact the owner in possession, can be received against but not in support of his own interests. In the latter event he would have an incentive to misrepresent and his declarations would not be admissible under the rule. *Borden* v. *Westport,* 105 Conn. 139, 147, 134 Atl. 803; *Smith* v. *Martin,* 17 Conn. 399, 401. Sherwood's declaration was that of a person deceased and he would have been a competent witness if living. During his entire life he had been an owner of property very near these premises and had often been on them. His familiarity with the premises certainly gave him peculiar means of knowing them and their extent, means which members of the public generally did not enjoy. The statement was made before this controversy arose, and it did not appear that the declarant had any incentive to misrepresent. The position of the declarant was such that there was no reason to expect misrepresentation, and he was not speaking in support of his own title or of one claiming under him. *Turgeon* v. *Woodward,* 83 Conn. 537, 541, 78 Atl. 577; *Merwin* v. *Morris,* 71 Conn. 555, 572, 42 Atl. 855.

It should be borne in mind that this entire controversy involves a matter of peculiar difficulty, the fixing of an ancient bound after the lapse of two centuries and a quarter from the original grant of the mill property. Obviously there could not be in the nature of things, testimony from the lips of living witnesses who had personal knowledge as to where the original bounds were fixed by many of the ancient transfers. It is one of the necessities of such a situation, if disputes are to

be finally settled at all, that some of the strictness of our rules regarding hearsay evidence shall be softened in the interest of all concerned, recognizing, as we did in *Turgeon* v. *Woodward, supra,* that otherwise there must be a practical abandonment of all attempts to prove such lines; and further, that it is "established and general knowledge that the great majority of human affairs are more or less affected by reliance upon hearsay without imperilling their trustworthiness, or their efficiency and safety. . . . In such way the law uses, in many cases, the only available evidence, and the truth benefits by its use. The difficulty of proving private boundaries furnished the indispensable and urgent necessity for the admission of declarations of the deceased with respect to them." (p. 540.)

The next assignment of error relates to the admission of the testimony of Henry R. Sherwood who was asked: "Have you ever talked with any other aged men who are now dead, or have you heard any other aged men make any statements concerning the general reputation as to this particular beach that I have just described to you?" The witness replied: "I have heard my father and grandfather," and also stated that they had been dead many years. This is clearly a statement that the witness had heard these men of a past generation speak of the general reputation of the premises. He was then asked more specifically what the occasion was for such statements and replied: "Well, a good many years ago there used to be an argument between the people over further to the east and Greens Farms [in which the premises in dispute were located], where the owners of the property used to put up a gate or fence to try to keep the public out. When these occasions arose I know my father and grandfather used to say, 'Well, there are two places left where we will never be barred

out; one is Cedar Point and the other is Compo Mill beach.'" This obviously indicates a knowledge of the views of the general public as to the character of these two beaches, and shows the reputation which attached to them. The witnesses were "the mouthpiece of the reputation." The plaintiff apparently has in mind the legitimate distinction existing between public reputation and mere private opinion. Upon this point, Wigmore, in Vol. 3, at page 333 *et seq.*, states a question for a witness as follows: "What have you heard old men, now deceased, say as to the reputation of this place?" The distinction is a somewhat narrow one, but we think the questions and answers shown in this case properly reflect the principle upon which reputation evidence is admitted. The admission of this evidence was not error.

There were numerous claims of law made by the plaintiff at the trial and the overruling of each of these is separately assigned as error. Some of the questions have already been disposed of by what has been said. The remaining questions raised by these assignments may be summarized as follows: The plaintiff claimed as matter of law, that the evidence disclosed no record title in either the State of Connecticut or in the Town of Westport, and therefore the conveyance to the plaintiff and his possession having been shown, it conclusively established the plaintiff's title; that the unorganized public could not acquire a title above mean high-water mark; that the unorganized public could not obtain title above high-water mark on behalf of the State of Connecticut or the Town of Westport without having claimed ownership before this action was brought; that the use of this tract above high-water mark by the unorganized public differed only in degree from that of all beaches in that vicinity; that a dedication must be shown to be unequivocal and inten-

tional and to have been accepted, and that the evidence of dedication given at the trial was not inconsistent with a license by successive owners to the general public to use the beach.

In the complaint the plaintiff alleged that he had a title in fee simple to the premises in question. He assumed the burden of establishing that. Upon prima facie proof by him, the burden of showing the contrary rested upon the defendants. The plaintiff now asserts that he did establish a prima facie title in fee. We are well aware of the numerous obscurities and indeed discrepancies which are apparent in many of these old documents. There was not that precision of description or lay-out in the days of Indian and Colonial grants that exists today. The plaintiff lists a large number of these old deeds in his abstract of title, and he asserts that they include, in the descriptions contained in them, the land in question and that this implied constructive possession. If the premises were in fact thus included in the descriptions, his claim of constructive possession is sound. *Dawson* v. *Orange,* 78 Conn. 96, 107, 61 Atl. 101; *Noyes* v. *Stillman,* 24 Conn. 14, 21; *Waterbury Clock Co.* v. *Irion,* 71 Conn. 254, 259, 41 Atl. 827; *Merwin* v. *Morris,* 71 Conn. 555, 573, 42 Atl. 855; 22 R. C. L. p. 81, § 60. A long study of these papers, however, in connection with the finding confirms us in the conclusion, as we have already intimated, that the trial court's action in fixing the western boundary line of the mill property where it did, cannot be disturbed. This being so, and the premises in dispute lying west of that line, the plaintiff can have no record title to them, nor constructive possession of them. He attempted to support his claim of possession in part, by showing that he had filed tax lists and a map and paid taxes upon these premises. He claims to have acquired title in 1901, but the record shows

that he did not file a tax list or pay taxes upon the property for thirteen years, and then for the first time he claimed to list the property as his own. These acts of filing tax lists and a map, and paying taxes, while they were admissible as evidence, were subject to an explanation which largely destroyed their value, and in any event they cannot avail against the conclusion of the trial court that he then had no record title to the property. It is significant, though of course not conclusive, that the line found by the court, gives the mill property 1.34 acres, which very closely approximates the amount of land shown by the early deeds to have been granted. We cannot speculate, as the plaintiff's suggestions would require us to do, upon the possibility that land may have been added by accretion during the years or by filling in. The plaintiff also makes the alternative claim that if he has no record title, yet a title in himself will be presumed because he and his predecessors in title have had actual possession for one hundred and thirty years. The court has not found this or any other possession by the plaintiff, nor has the plaintiff sought to have the court find it. The record itself fails to support the claim of actual possession. The record shows, moreover, that notwithstanding his present claim of ownership and possession, the plaintiff waited for more than twenty years before making any attempt to establish title, and has never ventured to deed the property to anyone, while nearly all that to the eastward which is clearly within his grant, has been disposed of by him. When making his deed to Helen R. Mitchell, of land contiguous to this on the east, the plaintiff placed her western line substantially where the trial court has found the boundary line of the disputed property to be. All this carries a strong presumption that the plaintiff then considered

the line to be about where the court has since determined it to be.

The ruling of the trial court that the plaintiff has never had any right, title or interest in these disputed premises, is abundantly supported by the subordinate facts and by the entire record, to some aspects of which we have referred in discussing the plaintiff's claims of law.

The remaining assignments of error relate to the contention of the plaintiff that neither the State of Connecticut nor the Town of Westport ever had a title of record or any title or right by use by the unorganized public, or otherwise.

The plaintiff claims to derive his title directly through Thomas Ockley, who received his grant from the town. Yet he now claims that the original charter and the Indian and Colonial grants did not confer titles but only fixed boundaries and conferred jurisdiction. A plaintiff may not deny his predecessor's title. *Catlin* v. *Decker,* 38 Conn. 262, 266; *Thomas* v. *Young,* 81 Conn. 702, 705, 71 Atl. 1100.

However, since the decision of the trial court that the plaintiff himself has no title or interest in these premises must stand, this last phase of the case and the assignments based thereon become of no importance upon this appeal and need not be considered. Having failed to prove his own title, the plaintiff is not permitted to question that of the defendants, nor to assign as error the rulings of the trial court relating thereto. *Roberts* v. *Merwin,* 80 Conn. 347, 350, 68 Atl. 377.

There is no error.

In this opinion the other judges concurred.